# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| MARK ROBERT BURROWS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13-CV-55 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Acting Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Mark Robert Burrows. For the reasons set forth below, the Commissioner of Social Security's final decision is **AFFIRMED.**

BACKGROUND

On September 6, 2011, Plaintiff, Mark Robert Burrows ("Burrows"), applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 et seq., and Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. section 1383 et seq. In his application, Burrows alleges disability under the

1

Social Security Act since November 2010. The Social Security Administration denied his initial application and also denied his claim on reconsideration. Burrows requested a hearing, and on December 20, 2012, he appeared via video teleconference, represented by counsel, at an administrative hearing before Administrative Law Judge ("ALJ") MaryJoan McNamara. Testimony was provided by Burrows and Dennis Conroy, a vocational expert ("VE"). On May 24, 2013, ALJ McNamara issued a decision denying Burrows' claims and finding him not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of unskilled, light level jobs in the national economy.

Burrows requested that the Appeals Council review the ALJ's decision, but this request was denied on July 16, 2013. Accordingly, the ALJ's decision became the Commissioner's final decision. See 20 C.F.R. § 422.210(a) (2005). Burrows has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Facts

The basic facts of this case are not in dispute, and Burrows has not filed a reply brief. As such, the Court has borrowed liberally from Burrows' recitation of the facts including his

description of the testimony and medical evidence, and any relevant additional facts will be noted in the body of this order.

Burrows, who was born on October 11, 1958, testified that he has a twelve year old daughter with whom he spends time watching television, reading, and attending church. (TR 31, 46-47.) He testified that sometimes he tries to color with her, but he is unable to do so for long because hanging his head down causes him pain. (TR. 47.)

Burrows reported that in November of 2010, he had an automobile accident where he was rear ended. (TR 34-35.) Approximately six months later, he worked for three weeks in 2011 doing construction for Grand Industrial; however, he chose to quit that job because he was experiencing pain while working, and his request to perform light work had been denied. (TR 31-32.) Burrows also worked one day in 2011 for Wabash National Trailer Manufacturing Company as a welder, but when he was required to hit steel with a hammer, he reported that pain shot across his shoulders and up his neck which led him to believe that the work was not feasible. (TR 33.) Burrows also testified that he has headaches for which he takes pain medication. (TR 45-46.)

Burrows stated that he stopped drinking in 1996 but that he still currently smokes a pack or less of cigarettes per day. (TR 42.)

Burrows testified that he had spent the day before the hearing sitting in a chair watching television for eight hours. (*Id.*) He stated that he had gotten up only to use the bathroom, get coffee, and walk into his daughter's room to check on her turtle. (*Id.*)

Burrows testified that he can dress himself but needs help putting on his coat because of trouble reaching back with his arms and shoulders. (TR 43.) Burrows further testified that he does not take out the trash, that his daughter feeds the dog, and that he goes to the grocery store with his wife but that she picks up the groceries. (TR 44.) Burrows estimated that he can sit for between a half hour and an hour but not for longer than that because he gets sore in his lower back and rear end. (TR 49.) He stated he can stand for fifteen to twenty minutes at a time but that his head gets heavy after that and he needs something to lean back on because of his neck. (TR 49-50.) He believes that throughout an eight hour day, he can stand for ten to fifteen minutes out of every hour. (TR 50.)

Burrows testified that there was a period of time that he did not take or receive pain medication because he did not have insurance. (*Id.*) He was eventually able to return to the doctor and begin taking pain medication again because he got on the Healthy Indiana Plan. (TR 51.)

The medical evidence of record can be summarized as follows:

On August 8, 2011, Burrows saw Rene Gutierrez, MD ("Dr. Gutierrez"), for a checkup. The history of the present illness was noted to be neck pain new onset, acute worsening of chronic condition, midline, sharp, shooting, intermittent, worse with movement of head and worse with turning the neck. It was noted to be better with rest or after a chiropractic adjustment. On neck range of motion testing, Burrows had limited lateral bending and limited flexion and extension. He also had central vertebral C4-7 tenderness and paraspinal muscle spasm was present bilaterally. Dr. Gutierrez diagnosed cervicalgia. (TR 226.)

On August 11, 2011, Burrows underwent an MRI of the cervical spine, which found a slight accentuation of normal lordotic curvature at the C6 level and mildly heterogeneous marrow signal and partially bridging anterior osteophytes at multiple levels. The discs were also desiccated with disc space narrowing present in C4-5 through C6-7. The cord also had accentuated lordotic curvature following the inner contour of the spinal canal, which was narrowed. (TR 222.)

Specifically, at C2-3, uncinate process hypertrophy produced moderately severe rightward foraminal stenosis. At C3-4, there was mild annular disc bulge that minimally effaced the ventral aspect of the thecal sac and the exit foramina were narrowed by uncinated process hypertrophy, minimally on the right and mild to moderately on the left. At C4-5, there was a broad-based bar of

osteophytic spur/hard disc that produced mild central stenosis and abutted the central surface of the cord. There was also uncinate process hypertrophy at C4-5 that produced bilateral, moderately severe foraminal stenosis. At C5-6, there was a broad-based bar of osteophytic spur/hard disc that produced moderate central stenosis and there was uncinate process hypertrophy that produced moderate leftward foraminal stenosis and moderately severe rightward foraminal stenosis. At C6-7, there was a broad-based annular disc bulge and small central subligamentous disc protrusion, disc-osteophyte complex posteriorly that produced moderate to severe central stenosis, and uncinate process hypertrophy that produced bilateral moderately severe foraminal stenosis. (TR 222-223.)

The overall impression was moderately severe acquired central stenosis at C6-7 due to disc osteophyte complex and superimposed central subligamentous small broad-based protrusion; moderate acquired central stenosis at C5-6 due to disc-osteophyte complex; mild acquired central stenosis at C4-5 due to disc-osteophyte complex; and multilevel foraminal stenosis, moderately severe bilaterally at C4-5, C5-6 and C6-7. (TR 223.)

On August 15, 2011, Burrows returned to Dr. Gutierrez. On exam, he had slight restriction on extension with neck range of motion testing, central C5-7 spine tenderness, and bilateral paraspinal muscle spasm at multiple levels. Dr. Gutierrez

diagnosed cervicalgia and spinal stenosis in the cervical region at multiple levels, and severe stenosis and disc herniation at C6-7. (TR 224.)

On August 29, 2011, Burrows saw Dr. Jeffrey L. Crecelius ("Dr. Crecelius") at Goodman Campbell Brain and Spine. Burrows reported that he had been in a motor vehicle accident in November 2010. Shortly after the accident, he stated that he had developed some right arm pain that was sharp. He then developed some pain in the neck and down in the cervicothoracic area, as well as headaches. As this progressed, it was associated with sharp right scapular pain. Burrows reported that his pain was sometimes excruciating and interfered with his sleep. (TR 234.)

On exam, Burrows had a positive foraminal closure sign and his reflexes were hypoactive. However, the examination was otherwise normal neurologically, including preserved muscle strength. Dr. Crecelius noted that previous AP and lateral plain films showed "some" degenerative change and that a cervical MRI showed degenerative change with severe stenosis at C6-7, moderate stenosis at C5-6 and mild stenosis at C4-5. His overall assessment was that Burrows was predominantly symptomatic from the C6-7 segment but that the C5-6 segment may be bothersome as well. He also appeared to have degenerative disease which was exacerbated by the traumatic event reported. Dr. Crecelius "offered consideration" of a surgical disc removal and fusion but noted

that Burrows had indicated that "he had not reached a point where he wished to give any consideration to surgical intervention." (TR 235.)

On October 3, 2011, Burrows had a chiropractic appointment with William J. Misenheimer, DC, due to headaches and pain in his neck and upper back. He described the pain as sharp and achy. On exam, his cervical and thoracic range of motion was restricted/fixed, and he had vertebral subluxation/misalignment at C6 and T4. Dr. Wisenheimer noted that he had difficulty with changing positions, lifting and carrying. (TR 236.)

On October 19, 2011, Burrows underwent a disability/internal medicine exam with Dr. William G. Terpstra ("Dr. Terpstra"). He alleged disability due to severe whiplash to his neck, headaches, and back pain. He reported that, since his accident in 2010, he had almost daily occipital headaches, posterior neck and upper back pain. On examination, Dr. Terpstra observed a slightly reduced range of motion of Burrows' neck, full strength and muscle tone, a normal gait, and negative straight leg raising tests. He reported that Burrows could tandem walk, walk on tiptoes, and squat without difficulty. Dr. Terpstra diagnosed Burrows with degenerative disc disease of the cervical spine; however, he noted that Burrows was not having a "whole lot of pain necessitating much medication" and indicated that Burrows would be able to stand/walk for most if not all of an eight hour day and to use his

upper extremities for lifting/carrying less than ten pounds frequently and over ten pounds occasionally. Dr. Terpstra opined that he would not expect any impairment with respect to work related activities such as sitting, standing, walking, lifting, carrying and handling objects. (TR 241-43.)

On October 28, 2011, DDS medical consultant M. Ruiz, MD ("Dr. Ruiz"), listed degenerative disc disease as Burrows' primary diagnosis. Dr. Ruiz opined that Burrows had the ability to perform light exertional work with frequent posturals and only occasional ladders, ropes, and scaffolds and crawling, and limited to reaching in all directions. (TR 244-252.)

On September 17, 2012, Burrows presented to Dr. Clinton Kauffman ("Dr. Kauffman") complaining of chronic neck pain that increased with relatively minimal activity. He stated that he was unable to lift. Dr. Kauffman diagnosed cervical spinal stenosis. On October 22, 2012, he returned to Dr. Kauffman. It was noted that Burrows wanted to discuss a referral to an orthopedic specialist for his neck. It was also noted that he had seen neurosurgery in the past and had been recommended for surgery. Dr. Kauffman again diagnosed cervical spinal stenosis. (TR 261-66.)

On October 26, 2012, Dr. Kauffman filled out a Medical Source Statement of Ability To Do Work-Related Activities ("October 2012 Disability Statement"). He opined that Burrows could never lift

and/or carry up to ten pounds or anything heavier. He could sit for one hour at a time without interruption for a total of five hours in an eight hour workday, stand for forty-five minutes at a time without interruption for a total of two hours in an eight hour workday, and walk fifteen minutes at one time without interruption for a total of one hour in an eight hour workday. (TR 267-68.)

Dr. Kauffman further opined that Burrows could frequently handle and finger with either hand and continuously feel with either hand, but he could never push/pull with either hand and he could never reach overhead or do any other reaching with either hand. He could continuously operate foot controls with either foot. In addition, Burrows could never climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. He could only occasionally operate a motor vehicle. He is unable to perform activities like shopping or walking a block at a reasonable pace on rough or uneven surfaces. (TR 269-72.)


Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347, F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law *de novo*, and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled. To qualify as disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:  Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2:  Is the claimant's impairment or combination of impairments "severe" and expected to last at least

twelve months?  If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3:    Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1?  If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4:    Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5:    Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v).

In this case, the ALJ found, under 20 CFR 404.1520(c) and 416.920(c) that Burrows suffers from the following severe impairments: degenerative disc disease of the cervical spine and headaches.  (TR 16.)  The ALJ further found, under 20 CFR Part 404, Subpart P. Appendix 1, that Burrows' impairments individually and in combination did not meet or medically equal one of the listed impairments.  (*Id.*)  The ALJ determined that Burrows has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  (*Id.*)  Based on Burrows' RFC, the ALJ found that Burrows is not capable of performing his past relevant work as a welder or supervisor.  (TR 20.)  However, the ALJ did find that there are jobs that exist in significant number in the national economy that Burrows can perform.  (TR 20-21.)  In making this

determination, Burrows believes that the ALJ committed an error which requires reversal.

The Weight Given to Burrows' Treating Physician

Social Security Ruling ("SSR") 96-2p provides that a treating physician's medical opinion must be given controlling weight if it is "well supported and not inconsistent with other substantial evidence in the case record." Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. Additionally, 20 C.F.R. § 404.1527(d)(2) establishes six criteria that should be evaluated when determining the weight that should be given to a treating physician's medical opinions. See *Butera v. Apfel*, 173 F.3d 1049, 1056 (7th Cir. 1999). The six criteria are:

1) the nature and extent of the treatment relationship;
2) the degree to which the medical signs and laboratory findings support the opinion;
3) the degree to which the opinion takes into account all of the pertinent evidence in the record;
4) the persuasiveness of the opinion rendered;
5) the consistency of the opinion with the record as a whole;
6) the specialization of the physician.

20 C.F.R. § 404.1527(d)(2) and 416.927(a)-(d)). An ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and if it is consistent with other substantial evidence in the record. *Hofslein v. Barnhardt*, 439 F. 3d, 375, 376 (7th Cir. 2000); *Clifford v. Abfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(d)(2); SSR 96-8p; SSR96-2p. Generally, ALJs weigh the opinions of a treating source more heavily because that source is more familiar with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2). However, a claimant is not entitled to benefits merely because a treating physician labels her as disabled. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). A medical opinion may be discounted if it is internally inconsistent or inconsistent with other substantial evidence in the record. *Clifford*, 227 F.3d at 870. While an ALJ is not required to award a treating physician controlling weight, the ALJ must articulate, at a minimum, his reasoning for not doing so. *Hofslien*, 439 F.3d at 376-77. Although an ALJ is required to consider and discuss a treating physician's opinion, see 20 C.F.R. § 416.927(c)(2), the ALJ is not bound by conclusory statements of doctors or medical opinions that are unsupported or inconsistent with substantial evidence in the record. See *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). "If the treating physician's opinion is inconsistent with the consulting physician's opinion, internally

inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). The ALJ's reasoning should be based on relevant factors applied to the medical opinions as stated above. *See* 20 C.F.R. § 404.1527(d)(2)-(6).

Burrows claims the ALJ erred in evaluating the opinion of Burrows' treating physician, Dr. Kauffman, and erroneously rejecting that opinion for reasons unsupported in the record. Specifically, Burrows takes issue with the ALJ's reference to the fact that ultimate determinations of disability are left to the Commissioner, and he also asserts that the ALJ erred when she discredited Dr. Kauffman's opinion for reasons related to the length of treatment.

In her decision, the ALJ acknowledged that Dr. Kauffman had treated Burrows, but she noted that the record did not reflect a relationship of "supportability" or "longevity" at the time of Dr. Kauffmann's October 2012 Disability Statement because such treatment had only begun in August of 2012. (Tr. 19.) The ALJ discussed the limitations described in Dr. Kauffman's October 2012 Disability Statement on Burrows' ability to do work-related activities. (*Id.*) The ALJ specifically cited to Dr. Kauffman's opinion that Burrows was limited to never lifting or carrying up to ten pounds, that he could only stand up to two hours and walk up to one hour in an eight hour workday, and that he should never reach or push/pull, climb

ramps or stairs, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl. (*Id.*) In giving these opinions little weight, the ALJ explained that the October 2012 Disability Statement was unsupported by and inconsistent with the medical evidence of record, including Dr. Kauffman's own treatment notes. (*Id.*) The ALJ opined that Dr. Kauffman's own treatment notes "clearly reflected that the claimant's coordination, gait, extremities, and strength were all within normal limits and that the testing showed the claimant had no neurological problems." (*Id.*) The ALJ directly referenced Dr. Kauffman's September and October 2012 examinations, which were largely within normal limits. (*Id.*; TR 261-66.) The ALJ noted that Burrows had normal strength, tone, and range of motion without pain, and she cited to Dr. Kauffman's assessment that he had a "full range of motion and [was] supple." (*Id.*) As such, the ALJ opined that Dr. Kauffman's limitations described above were "so restrictive as to defy plausibility compared to his notes or that of other sources." (*Id.*) The ALJ also noted that Dr. Kauffman himself acknowledged that the October 2012 Disability Statement was based on Burrows' own assessment of his ability rather than any formal limitation testing performed. (*Id.*; TR 261.) In closing her paragraph on Dr. Kauffman, the AlJ stated, "[m]oreover, determinations of disability are left to the Commissioner."

In support of her decision, the ALJ described the opinion of Dr. Crecelius,[1] whose examination indicated that Burrows displayed largely normal strength and neurological results. (TR 18, 234-35.) The ALJ stated that while Dr. Crecelius' testing and examination showed that Burrows had slowed reflexes, he had an otherwise normal neurological exam including preserved muscle strength. (*Id.*) The ALJ also noted that Dr. Crecelius had reviewed Burrows' neck MRI that showed "some" degenerative changes with severe stenosis at C6-7, moderate stenosis at C5-6, and mild stenosis as C4-5; however, she pointed out that Dr. Crecelius offered consideration of a surgical disc removal and fusion which Burrows refused because he had not reached a point where he wanted to consider surgical intervention. (*Id.*)

The ALJ also relied on Dr. Terpstra's opinion and noted that the consultative examination of Burrows revealed that he was in no acute distress and had full muscle strength and tone, normal gait and station, straight leg testing which was negative bilaterally, and only a slightly reduced range of motion of the cervical spine. (TR 18, 241-43.) The ALJ stated that, despite degenerative disc findings on Burrows' neck MRI, Dr. Terpstra had noted that Burrows was not having much pain and was not taking much medication at that point. (*Id.*) As such, the ALJ gave Dr. Terpstra's opinion regarding

[1] The ALJ incorrectly attributes these findings to Dr. Gutierrez to whom Dr. Crecelius addressed his report, but accurately states Dr. Crecelius' findings. (Tr. 234-35.)

only slight limitations (that Burrows could stand/walk for most if not all of an eight hour day and use his upper extremities for lifting/carrying less than ten pounds frequently and over ten pounds occasionally) significant weight. (*Id.*)

Burrows contends that it was contradictory and confusing for the ALJ to discount Dr. Kauffman's opinion based on a lack of treatment longevity when he gave significant weight to the consultative medical examiner, Dr. Terpstra, and the State agency medical consultant, Dr. Ruiz, whom had only examined Burrows once and never, respectively. Burrows argues that the ALJ failed to build a logical bridge for discrediting Burrows' treating source in favor of those doctors who had little to no examining relationship with Burrows.

It is true that "[g]reat weight is assigned the more times the treating source has examined the claimant and the more knowledge the treating source has regarding the claimant's conditions. *Harder v. Astrue,* No. 2:11-CV-00370, 2013 U.S. Dist. Lexis 4981 at *45 (N.D. Ind. Jan. 11, 2013). And generally, a one-time examination should be afforded less weight when it is contradictory to the other evidence of record. *Criner v. Barnhardt*, 208 F. Supp. 2d, 937, 955 (N.D. Ill. 2002). However, in discounting the opinion of Dr. Kauffman, the ALJ clearly articulated the inconsistencies between the opinion of Dr. Kauffman and the record as noted above; she stressed that Dr. Kauffman's highly restrictive October 2012

Disability Statement was even inconsistent with his own treatment notes, and she pointed out that Dr. Kaufmann's opinion was based on Burrows' own assessment of his ability rather than any formal limitation testing performed. Conversely, the ALJ described the opinions of Dr. Terpstra and Dr. Ruiz as being consistent with the medical evidence, including Dr. Crecelius's records and Dr. Kauffman's own treatment notes. See *Ketelboeter*, 550 F.3d at 625 ("If the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it.") Furthermore, immediately after noting that Burrows had only begun treating with Dr. Kauffman in August of 2012, the ALJ opined that Dr. Kauffman's records, including the October 2012 Disability Statement, did "not reflect supportability or longevity." Thus, she acknowledged that the length and type of treatment relationship was not of the kind that would automatically confer deferential status to Dr. Kauffman's opinion. See 20 C.F.R. § 404.1527; 20 C.F.R. § 404.1502; see also *Scheck v. Barnhart*, 357 F.3d 697, 702–03 (7th Cir. 2004) ("It would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail or longitudinal view*.") (emphasis in original). Therefore, despite Burrows' assertions to the contrary, the ALJ did

adequately articulate her reasons for giving Dr. Kaufman's opinion less weight than those of Dr. Terpstra and Dr. Ruiz.

Burrows also argues briefly that the ALJ erred when she discredited Dr. Kauffman's opinion by making the point that determinations of disability are left to the Commissioner. Burrows asserts that Dr. Kauffman's October 2012 Disability Statement should not be discredited "[m]erely because that opinion leads to a finding [of disability]." However, as described in detail above, the ALJ did not discount Dr. Kauffman's opinion "merely" because it suggested a determination of disability; rather, she clearly articulated other reasons for doing so, and a passing reference to SSR 96-5p does not negate that analysis.

In sum, the ALJ's decision provided specific reasons for not crediting Dr. Kauffman's opinion (namely, that the October 2012 Disability Statement was highly restrictive, implausible, and inconsistent with his own treatment notes and the other medical evidence of record and that Dr. Kauffman's records did not reflect supportability or longevity). Those reasons are supported by evidence in the case record as a whole and are sufficiently specific to make clear to any subsequent reviewers the weight she gave to Dr. Kauffman's opinion and the reasons for that weight. Thus, the Court finds that the ALJ's decision is legally sound, supported by substantial evidence, and does not require reversal and remand.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **AFFIRMED.**


**DATED: September 30, 2015**            <u>**/s/RUDY LOZANO, Judge**</u>
                                        **United States District Court**